UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH BECKER, DON G. LANDERS, GAYLE UNGLESBY, LYNN PHILLIPE, JESSIE ROMIC, THOMAS KIEBACH, TERRY BEVEN, M.D., PATSY J. HEBERT, PATRICK HANEY, and KEVIN COURVILLE, <br><br> Plaintiffs <br><br> VERSUS <br><br> JASON GREEN, GRADY LAYFIELD, RON CLAYTON, MICHAEL WORD, HANK MILLS, DIRK HARRIS, ABC INSURANCE COMPANY, XYZ INSURANCE COMPANY, ABC BOND COMPANY, and RST INSURANCE COMPANY, <br><br> Defendants. | CIVIL ACTION NO.: <br><br> JUDGE: <br><br> MAGISTRATE: |

## DEFENDANT JASON GREEN'S PETITION FOR REMOVAL

Defendant Jason Green hereby removes to this Court the state-court action described below pursuant to the Court's federal subject matter jurisdiction.

### INTRODUCTION

1. On March 17, 2009, Joseph Becker, Don G. Landers, Gayle Unglesby, Lynn Phillipe, Jessie Romig, Thomas Keibach, Terry Beven, M.D., Patsy J. Hebert, Patrick Haney, and Kevin Courville ("Plaintiffs") commenced this action.

2. This action was filed in the 19th Judicial District Court for the Parish of East Baton Rouge, entitled *Joseph Becker, Don G. Landers, Gayle Unglesby, Lynn Phillipe,*

1

*Jessie Romig, Thomas Keibach, Terry Beven, M.D., Patsy J. Hebert, Patrick Haney, and Kevin Courville v. Jason Green, Grady Layfield, Ron Clayton, Michael Word, Hank Mills, Dirk Harris, ABC Insurance Company, XYZ Insurance Company, ABC Bond Company, and RST Insurance Company*, No. 576503, Division "24" (the "Petition").

3. The Petition names as defendants Jason Green, Grady Layfield, Ron Clayton, Michael Word, Hank Mills, and Dirk Harris (the "Individual Defendants"). It also names as defendants ABC Insurance Company, XYZ Insurance Company, ABC Bond Company, and RST Insurance Company – each alleged to be insurers or bonding companies that issued errors-and-omissions policies, directors-and-officers policies, fidelity bonds, or comprehensive general liability policies covering the Individual Defendants. (Petition ¶ 2(A)-(K).)

4. Venue is proper under 28 U.S.C. ¶ 1441(a) because this Court is the district and division embracing the place where this action is pending.

5. Mr. Green has attached a copy of all process, pleadings, and orders filed in the state court. (*See* Exhibit A.) Plaintiffs first served a defendant in this case on March 18, 2009. (*Id.*) Thus, this Notice of Removal is timely and in compliance with 28 U.S.C. § 1446(b).

6. The undersigned have contacted counsel for all Individual Defendants served with the Petition, and each consents to this removal. The unidentified insurance and bonding companies defendants have not been served. (Exhibit B.)

## BACKGROUND

7. On March 17, 2009, Plaintiffs filed their Petition in the 19th Judicial District Court for the Parish of East Baton Rouge. Plaintiffs' Petition alleges the Individual Defendants were Plaintiffs' investment advisors and that – as employees and investment advisors of and for the Stanford Group Company and Stanford Capital Management – they made

2

negligent misrepresentations to Plaintiffs regarding a host of wrongdoing by Stanford International Bank, Ltd., Stanford Group Company, and Stanford Capital Management (the "Stanford Group Companies"). Plaintiffs claim, as well, the Individual Defendants breached fiduciary duties and violated Louisiana's Unfair Trade Practices Act and Securities Law.

8. Among other things, Plaintiffs seek a preliminary injunction enjoining Defendants from "transferring or encumbering any assets under Defendants' control that may be required to compensate the Plaintiffs for their damages" and enjoining Defendants from destroying, deleting, erasing, transferring or otherwise placing Defendants' documents beyond the reach of the 19th Judicial District Court. (Petition ¶ 125(a).) Plaintiffs pray for actual damages, attorney fees, and interest. (*Id*. ¶ 125(d)-(e).)

9. One month before Plaintiffs filed suit, the Securities and Exchange Commission ("SEC") filed a Complaint against the Stanford Group Companies, R. Allen Stanford, James M. Davis, and Laura Pendergest-Holt in the U.S. District Court for the Northern District of Texas, styled *Securities and Exchange Commission v. Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, R. Allen Stanford, James M. Davis, and Laura Pendergest-Holt*, No. 3-09CV0298-L (the "SEC Complaint, attached as Exhibit C).[1]

10. The SEC Complaint asserts the defendants named therein engaged in "a massive, ongoing fraud" – specifically, that Stanford International Bank ("SIB"), acting "through a network of [Stanford Group Company] financial advisors, has sold approximately $8 billion of self-styled 'certificates of deposit' by promising high return rates that exceed those available through true certificates of deposits offered by traditional banks." (Complaint ¶¶ 1-2.) The

---

[1] The SEC filed an amended complaint on February 27, 2009. (Attached as Exhibit C-1.)

3

Complaint states that "SIB and its advisers have misrepresented to CD purchasers that their deposits are safe because the bank: (i) re-invests client funds primarily in 'liquid' financial instruments …; (ii) monitors the portfolio through a team of 20-plus analysts; and (iii) is subject to yearly audits by Antiguan regulators." (*Id.* ¶ 8.) The SEC claims the defendants, as a result of these acts, committed a host of federal securities violations, including violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10-b5 promulgated thereunder, Section 17(a) of the Securities Act of 1933, Sections 206(1) and 206(2) of the Advisers Act, and Section 7(d) of the Investment Company Act. (*Id.* ¶ 13.)

11. The same day, the SEC – citing as authority Sections 20(b) and 20(d) of the Securities Act of 1933, Sections 21(d) and 21(e) of the Securities Exchange Act of 1934, Sections 41(d) and 41(e) of the Investment Company Act of 1940, and Sections 209(d) and 209(e) of the Investment Advisers Act of 1940 – applied for a temporary restraining order, preliminary injunction, and orders freezing assets, requiring an accounting, requiring preservation of documents, and authorizing expedited discovery. (Exhibit D, introductory paragraph and ¶ 11.) Among other things, the SEC sought equitable relief similar to that sought by Plaintiffs here, including an injunction against the defendants and employees of the Stanford Group Companies from "destroying, removing, mutilating, altering, concealing, or disposing of, in any manner, any of their books and records or documents relating to the matters set forth in the Complaint, or the books and records and such documents of any entities under their control, until further ordered by the Court." (Application ¶ 4.)

12. The Dallas court granted the SEC's request and also issued an Order Appointing Receiver (the "Order"). In that Order, the court assumed "exclusive jurisdiction"

4

over the matter and took "possession of the assets … of whatever kind and description, wherever located … of the Defendants[.]"  (Order, attached as Exhibit E, ¶ 1.)

13. The Order is far-reaching and gives the receiver broad powers.  For example, the Order authorized the receiver to "immediately take and have complete and exclusive control … of the Receivership Estate [defined as all assets the defendants owned or controlled and all documents the defendants possessed or that were in the possession of any agent or employee of the defendants] and to any assets traceable to assets owned by the Receivership Estate."  (*Id*. ¶ 4.)  Further, the Dallas court ordered that the "officers, agents and employees" of the Stanford Group Companies preserve and retain all of their documents.  (*Id*. ¶ 13.)

14. The Order also enjoins civil actions such as Plaintiffs':

Creditors and all other persons are hereby restrained and enjoined from the following actions, except in this Court, unless this Court, consistent with general equitable principals and in accordance with its ancillary equitable jurisdiction in this matter, orders that such actions may be conducted in another forum or jurisdiction:

> (a) ***The commencement or continuation***, including the issuance or employment of process, ***of any judicial, administrative, or other proceedings against*** the Receiver, any of the defendants, the Receivership Estate, or ***any*** agent, officer, or ***employee related to the Receivership Estate, arising from the subject matter of this civil action***.  [*Id*. ¶ 7(a), emphasis added.]

Similarly, the Order enjoins creditors "and all other persons" from taking either "[a]ny act to obtain possession of the Receivership Estate assets" or "[a]ny act to collect, assess, or recover a claim … that would attach to or encumber the Receivership Estate," without prior court approval.  (*Id*. ¶ 8(c).)

15. Plaintiffs likely knew of the Dallas court's injunction and Order.  Indeed, Plaintiffs' Petition cites to the receiver multiple times.  (Petition ¶¶ 47, 55.)  Moreover, many

5

of Plaintiffs' allegations mirror the allegations the SEC first asserted against the Stanford Group Companies in the Dallas action. By way of example, the following allegations in Plaintiffs' Petition directly relate to the Dallas court action:

| *SEC Complaint* | *Plaintiffs' Petition* |
| --- | --- |
| "The commission structure also provided a powerful incentive for SGC financial advisers to aggressively sell CDs to United States investors, and aggressively expanded its number of financial advisers in the United States." (¶ 34.) | "The commission structure also provided a powerful incentive for Defendants to aggressively sell SIB CD'S [*sic*] to Plaintiffs." (¶ 15.) |
| "In selling the CD, SIB touted the liquidity of its investment portfolio. For example, in its CD brochure, SIB emphasizes the importance of the liquidity, stating under the heading 'Depositor Security,' that the bank focuses on 'maintaining the highest degree of liquidity as a protective factor for our depositors' and that the bank's assets are 'invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks.' Likewise, the bank trained SGC advisers that 'liquidity/marketability of SIB's invested assets' was the 'most important factor to provide security to SIB clients.'" (¶ 36.) | "In marketing the SIB CD's, SIB touted the liquidity of its investment portfolio. For example, in its marketing brochures, SIB emphasized the importance of the liquidity of the SIB CD, stating, under the heading 'Depositor Security,' that the bank focuses on 'maintaining the highest degree of liquidity as a protective factor for our depositors' and that the bank's assets are 'invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks.' Likewise, SIB trained SGC advisers that the 'liquidity/marketability of SIB's invested assets' was the 'most important factor to provide security to SIB clients.'" (¶ 13.) |
| "SIB's investment portfolio is not, however, invested in a 'well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks. Instead, Tier 3 (*i.e.*, approximately 90%) consisted primarily of illiquid investments – namely private equity and real estate…. The bank never disclosed in its financial statements its exposure to private equity and real estate | "In truth and fact, SIB's investment portfolio was not invested in a 'well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks.' Instead, the portfolio consisted primarily of illiquid investments[.]" (¶ 31.) |

6

| investments." (¶ 38.) | |

| | |
|---|---|
| "SIB told investors that their deposits were safe because the Antiguan regulator responsible for oversight of the Bank's investment portfolio, the Financial Services Regulatory Commission (the "FSRC"), audited its financial statements. But, contrary to the Bank's representations to investors, the FSRC does not verify the assets SIB claims in its financial statements. Instead, SIB's accountant, C.A.S. Hewlett & Co., a small local accounting firm in Antigua is responsible for auditing the multi-billion dollar SIB's investment portfolio." (¶ 43.) | "Defendants represented to Plaintiffs that … SIB's assets were independently valued by independent and governmental auditors and appraisers. Contrary to these representations to investors, SIB's assets were not audited or verified. Instead, SIB's accountant, C.A.S. Hewlett & Co., a small local accounting firm in Antigua was responsible for auditing SIB's multi-billion dollar investment portfolio…. Contrary to Defendants' representations to Plaintiffs, the Antiguan regulator responsible for oversight of the bank's portfolio, the Financial Services Regulatory Commission, did not audit SIB's portfolio or verify the assets of SIB as SIB claims in its financial statements." (¶¶ 34, 39.) |
| "As part of and in furtherance of these scheme, defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." (¶ 60.) | "Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." (¶ 101.) |

16. Plaintiffs do not allege they received prior approval from the Dallas court to proceed with this action.

**FEDERAL QUESTION JURISDICTION EXISTS IN THIS CASE**

17. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 28 U.S.C. § 1441 because this case presents a substantial federal question

– namely, whether the Dallas court has ***authority*** to enjoin this action under the federal securities law, federal common law, or, simply, under the court's "ancillary equitable jurisdiction" such that Plaintiffs' action may not proceed. (Order ¶ 7(a).)

18. Plaintiffs' suit – not only its prayer for civil money damages, but its request for a preliminary injunction as well – is "related to the Receivership Estate [and] aris[es] from the subject matter of" the Dallas action. (*Id*.) As such, this action is precisely the type of suit the Dallas court has attempted to enjoin through its Order. Plaintiffs' attempt to prosecute this action thus constitutes a ***direct challenge*** to the Order given the Dallas court's injunction of suits against "employees" of the Stanford Group Companies.

19. In addressing this suit, therefore, a court necessarily must determine whether the action may proceed or whether the Dallas court's Order prevents the suit from going forward. In making this determination, a court must consider the Dallas court's authority to enjoin this action, which is undoubtedly a federal question: Specifically, the Court must determine the scope of the Dallas court's authority to enjoin civil actions under Sections 20(b) and 20(d) of the Securities Act of 1933, Sections 21(d) and 21(e) of the Securities Exchange Act of 1934, Sections 41(d) and 41(e) of the Investment Company Act of 1940, and Sections 209(d) and 209(e) of the Investment Advisers Act of 1940, federal common law, and the court's "inherent equitable jurisdiction." The issue bears directly on federal law – the federal securities laws (to which a federal court has ***exclusive*** jurisdiction insofar as an action under the 1934 Securities Exchange Act is presented), federal common law, and a federal court's equitable jurisdiction.

20. Case law reveals instances where a federal injunction or stay purports to preclude state-court actions. Courts in these situations analyze federal law to decide whether a

9

competing state-court action may proceed in the face of a federal injunction. Here, this Court must analyze the breadth of federal securities law, federal common law, and/or a federal court's equitable jurisdiction – or, possibly, all of them – to decide whether this action may proceed. The core of this case – indeed, whether this action may exist at all – presents a substantial federal question and, therefore, falls under the Court's federal subject matter jurisdiction. *See Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 366 (5th Cir. 1995) (explaining that, if "the state court necessarily must look to federal law in passing on the claim, the case is removable regardless of what is in the pleading"); *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 389 (3d Cir. 2002) ("The state suit need not invoke a federal law in order to 'arise under' it for removal purposes. It is sufficient that the merits of the litigation turn on a substantial federal issue that is 'an element, and an essential one, of the plaintiff's cause of action.'"); *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 827 (2d Cir. 1964) ("Even though the claim is created by state law, a case may 'arise under' a law of the United States if the complaint discloses a need for determining the meaning or application of such a law."), *cert. denied,* 381 U.S. 915.

21. Plaintiffs' Petition presents a substantial federal question for two additional reasons. First, Plaintiffs' claims of negligent misrepresentation against employees of the Stanford Group Companies are derivative of the allegations asserted by the SEC against the Stanford Group Companies. Plaintiffs will have to prove the Stanford Group Companies actually engaged in the wrongdoing they allege before a factfinder can decide whether the Individual Defendants made negligent misrepresentations to Plaintiffs about the Stanford Group Companies' purported wrongdoing. The foundation of Plaintiffs' claims – whether the Stanford Group Companies engaged in securities fraud – requires resort to the federal securities laws, as evidenced by the SEC suit itself and by Plaintiffs' invocation in their Petition of many of the

10

allegations in the SEC Complaint. This, too, injects a substantial federal question in this case. *Gobble v. Hellman*, No. 02-0076, 2002 WL 34430286, *3 (N.D. Ohio, Mar. 26, 2002) (because "several counts of [p]laintiff's breach of fiduciary duty claims depend upon whether [d]efendants violated their duties under the Federal Exchange Act and SEC rules and regulations . . . the resolution of [the] claims requires a construction and adjudication of substantial questions of federal law, and [therefore federal] jurisdiction . . . is proper").

22. In addition, Plaintiffs assert the Individual Defendants misrepresented to them "(1) that its legal counsel had reviewed the formation and operations of SIB and the marketing of the SIB CD's and (ii) that the operation of SIB and the sale of the SIB CD's were in accordance with the law. In truth and fact, ***the operation was not in accordance with the laws of the United States based upon the recent reports of the receiver of SGC***. Had the defendants known that SIB was not be [*sic*] operated in accordance with the law, Plaintiffs would not have purchased the SIB CD's." (Petition ¶ 47, emphasis added.) This allegation, as well, presents a substantial federal question as the Individual Defendants allegedly misrepresented matters of United States federal law. *See Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 387 (1998) (section 1441(c) "explicitly provid[es] discretionary removal jurisdiction over entire case where federal claim is accompanied by a 'separate and independent' state-law claim").

**WHEREFORE,** Jason Green respectfully requests that this Court assume full jurisdiction over the cause herein as provided by law.

Respectfully submitted,

*/s/ Meredith A. Cunningham*
George C. Freeman, III, 14272
Meredith A. Cunningham, 26465
BARRASSO USDIN KUPPERMAN
 FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2400
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
Facsimile: (504) 589-9701

Attorneys for Jason Green

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Notice of Removal has been served upon all known counsel of record by facsimile, electronic mail or by placing same in the United States mail, postage prepaid and properly addressed, this 17th day of April, 2009.

*/s/ Meredith A. Cunningham*